**UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SAMIR OUFKIR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| COMCAST CABLE COMMUNICATIONS | ) |
| MANAGEMENTS, LLC, a Delaware corporation, | ) |
| CESAR MENA, an individual, | ) |
| ANDREA TERHUNE, an individual | ) |
| ANTHONY SIMPSON, an individual, | ) |
| MICHAEL BEJAR, JR., an individual, | ) |
| STEPHANIE KYLE, an individual, | ) |
| RYAN CRAIG, an individual, SARAH BRYANT, | ) |
| an individual, WILLIAM N. CONNORS, an | ) |
| individual, and JOHN DOES, | ) |
| | ) |
| Defendants. | ) |

**JURY DEMANDED**

**<u>COMPLAINT</u>**

NOW COMES, the Plaintiff, SAMIR OUFKIR, (“OUFKIR” or “Plaintiff”), by and through his attorneys, RADEMACHER & ASSOCIATES, and for his Complaint against Defendants, COMCAST CABLE COMMUNICATIONS MANAGEMENTS, LLC, a Delaware corporation, (“COMCAST”), CESAR MENA, an individual (“MENA”), ANDREA TERHUNE, an individual (“TERHUNE”), ANTHONY SIMPSON, an individual (“SIMPSON”), MICHAEL BEJAR, JR., an individual, (“BEJAR”), STEPHANIE KYLE, an individual (‘KYLE”), RYAN CRAIG, an individual (“CRAIG”), SARAH BRYANT, an individual (“BRYANT”), and

WILLIAM N. CONNORS, an individual ("CONNORS"), JOHN DOES, collectively referred to as "DEFENDANTS", states as follows:

**JURISDICTION AND VENUE**

1. This action is brought to remedy discrimination based on national origin pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981 and § 1983;

2. This action is brought to remedy race discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981;

3. This action is brought to remedy religious discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981;

4. This action is brought to remedy age discrimination pursuant to the Age Discrimination in Employment Act of 1967;

5. This action is brought to remedy violations due to disabilities pursuant to The American with Disabilities Act, as amended, 42 U.S.C. §§12101 et seq;

6. This action is brought to remedy harassment in violation to the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the American with Disabilities Act of 1990 specifically against Defendant COMCAST;

7. This action is brought to remedy violation of the Family Medical Leave Act 29 U.S.C §§2600 et. seq. as COMCAST has at least 50 employees with 75 miles as required by 29 U.S.C. §2611(2)(B)(ii) and MENA, TERHUNE, CRAIG, BRYANT, CONNORS, and JOHN DOES who exercised control over Plaintiff's employment and the decision to terminate.

8. This action is also brought under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 under the laws of the State of Illinois on the to the following causes of action:

a. This action is brought to remedy violations of the Illinois Civil Rights Act of 2006, pursuant to 740 ILCS 24/5, et seq.

i. For Plaintiff suffering injury to his person and damage to his property as a result of having been compelled to confess or provide information regarding an offense by force or threat of imminent bodily harm; and

ii. For Plaintiff suffering damages as a result of retaliatory action resulting to termination of employment.

b. This action is brought to remedy violations which allow for civil damages under the Illinois Criminal Code of 2012, pursuant to 720 ILCS 5/1 et seq.

i. Intimidation against MENA, SIMPSON, BEJAR, KYLE, CRAIG BRYANT, CONNOR, JOHN DOES and COMCAST pursuant to §5/12-6;

ii. Disorderly conduct against MENA, SIMPSON, BEJAR, KYLE, CRAIG, BRYANT, CONNOR, JOHN DOES and COMCAST pursuant to §5/26-1;

iii. Hate Crimes against MENA, SIMPSON, BEJAR, KYLE, CRAIG, BRYANT, CONNOR, JOHN DOES and COMCAST pursuant to §5/12-7.1;

9. Plaintiff alleges liability against COMCAST pursuant to the doctrine of respondeat superior.

10. Plaintiff alleges intentional infliction of emotional distress against MENA, TERHUNE, SIMPSON, BEJAR, KYLE, CRAIG, BRYANT, CONNOR, JOHN DOES, and COMCAST.

11. This action properly lies in this district pursuant to 28 U.S.C. §1391(b) because the events giving rise to this claim occurred in this judicial district.

12. Plaintiff has fully complied with all prerequisites to the jurisdiction of this Court. On April 11, 2018, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission ("EEOC"). A true and correct copy of the Charge is attached hereto and incorporated herein as Exhibit "A'.

13. On April 17, 2018, the EEOC issued its Notice of Suit Rights. A true and correct copy of this Notice of Suit Rights is attached hereto and incorporated herein as Exhibit "B".

## PARTIES

14. Plaintiff, SAMIR OUFKIR, ("OUFKIR" OR "Plaintiff") became a citizen of the United States of America on June 22, 2004 and is a resident of the State of Illinois, City of Oak Park, County of Cook. OUFKIR was born on August 10, 1969, in Rabat, Morocco. OUFKIR is a devout Muslim, has been married almost 20 years to a natural born American Christian woman, and they have two teenage children. OUFKIR is also disabled as defined in the American with Disabilities Act. OUFKIR began working for COMCAST on December 17, 2000 and was terminated on December 22, 2017. OUFKIR received an offer of employment by the ManTech International Corporation, Contractor to the Department of Justice (the "DOJ,") Systems Administrator-Field Engineer, 525 W Van Buren St, Chicago, IL 60607. Upon completion of DOJ's security vetting OUFKIR was cleared and began his new position in April 2018.

15. COMCAST is a Delaware limited liability company authorized to do business in Illinois with its registered agent, COMCAST CAPITAL CORPORATION, 1201 N. Market Street, Suite 1000, Wilmington, County of Newcastle, DE 19810. At all times relevant COMCAST employed more than 500 employees and is engaged in an industry affecting commerce, thereby rendering COMCAST an employer as defined in the American with Disabilities Act.

16. On information and belief, MENA is employed as Manager and thereafter as Supervisor of COMCAST during all times relevant to this action and is a resident of the State of Illinois and resides at 651 Lavina Court, Bolingbrook, County of DuPage, Illinois.

17. On information and belief, TERHUNE is at all times relevant an employee of COMCAST and is a resident of the State of Georgia and resides at 4301 Kingston Gate CV, County of Fulton, Georgia, 30341.

18. On information and belief, SIMPSON is at all times relevant an employee of COMCAST and is a resident of the State of Illinois and resides at 3612 Ridge Road, Geneva, County of Kane, Illinois 60134.

19. On information and belief, BEJAR is at all times relevant employed as a Security Investigator of COMCAST and is a resident of 12711 Wexford Drive, Plainfield, County of Kendall, Illinois 60585.

20. On information and belief, KYLE, is at all times relevant was employed as Director of Security for COMCAST and is a resident of 1375 Cranbrook Cir, Aurora, County of Kane, Illinois 60502-1305.

21. On information and belief, CRAIG at all times relevant is Vice President of IT of COMCAST and is a resident of the State of Georgia and resides at 344 E. Wesley Road NE, Atlanta, County of Fulton, Georgia 30305.

22. On information and belief, BRYANT at all times relevant is a Senior Vice President of COMCAST and is a resident of the State of Georgia and resides at 75 20th Street NW, Atlanta, County of Fulton, Georgia 30305-2004.

23. On information and belief, CONNORS at all times relevant is President of the Central Division of COMCAST and is a resident of the State of Georgia, County of Fulton, Alpharetta, Georgia 30022-6249.

## FACTUAL ALLEGATIONS

24. OUFKIR began working at COMCAST on December 17, 2000 and was terminated after seventeen (17) years and five (5) days of service to COMCAST on December 22, 2017.

25. During his 17 years at COMCAST, OUFKIR worked at several different call centers in the Chicagoland area, including call centers located in Oakbrook, Schaumburg, Tinley Park, Elmhurst, with his last assignment at the call center located at 1255 W. North Avenue, Chicago, IL 60622. (Collectively referred at as "Call Centers").

26. Throughout his employment, OUFKIR discharged all of his duties competently, performing the essential functions of his job and had an excellent, dedicated, loyal work ethic and performance.

27. For the first fifteen (15) years of his employment by COMCAST, OUFKIR enjoyed his work at COMCAST, enjoyed fellow employees and team members, had good working

relationships with his supervisors and managers, had routine job and performance reviews, received salary increases, and received increased job responsibilities and promotions.

28. OUFKIR was frequently allowed over the years by his then managers or supervisors to use his lunch hour to attend his physician appointments for treatment of his diagnosed medical conditions for ADHD, anxiety, and depression.

29. For several years prior to and throughout much of 2015, non-party David White ("WHITE") was employed as Manager Client Services.

30. OUFKIR’s last position that he held at COMCAST was as Client Services 2 Representative ("CSR") and was assigned to the North Avenue call center.

31. In or around April 2014, MENA was hired as Client Services Supervisor.

32. Several months later, WHITE left the employ of COMCAST and in August of 2016 MENA was promoted to Client Services Manager to fill the vacancy left by WHITE. These events occurred approximately 18 months prior to OUFKIR's termination of employment on December 22, 2017.

33. With MENA now promoted as the new Manager, OUFKIR reached out to MENA several times to schedule a meeting. As his new manager, OUFKIR wanted to meet and talk with MENA to generally discuss any work issues, any new expectations, and general issues. The other primary reason that OUFKIR requested the meeting with MENA was to discuss and provide information of his medical conditions, discuss triggers and reactions, discuss accommodations for continuing treatment, and answer/discuss any questions or concerns that MENA might have.

34. When they finally met, OUFKIR advised MENA of medical conditions that he had been diagnosed with and that he was seeking ongoing treatment. Specifically, OUFKIR advised MENA that he had ADHD, depression and anxiety for which he was prescribed and took medications and that he has was continuing to receive treatment.

35. MENA's response to OUFKIR providing him with this information was not a response that OUFKIR could or would have ever imagined. MENA loudly laughed and mocked OUFKIR and belittled him for having ADHD. MENA then displayed such cruelty and hatred as he laughed and yelled that "OUFKIR is a schizophrenic!" OUFKIR could immediately feel the onset of an anxiety attack.

36. As was typical of OUFKIR's anxiety attacks, his heart started racing and beating, he started sweating profusely with visible streams running down his face. The pounding in his chest traveled up into his head making it difficult to think and concentrate because of the loud pounding in his head. Whenever OUFKIR has an anxiety attack, the physical manifestations are visible to anyone within eye shot. MENA clearly saw the physical affects that OUFKIR was suffering and he continued this diatribe to berate and belittle OUFKIR for his anxiety and depression.

37. MENA's cruel and hateful behavior and words caused OUFKIR's anxiety attack to even worsen and to skyrocket further out of control. MENA did not display or demonstrate any concern or care as he observed OUFKIR's heart visibly beating out of his chest, MENA saw the sweat running down his face and neck because of his panic and anxiety, and MENA continued his vile display of hatred, anger, racism, intimidation, intentionally and purposefully to continue to cause OUFKIR to suffer such from this unexpected, unprompted, unfathomable assault by

MENA. OUFKIR stumbled and gasped for air so he would not suffocate, trying desperately to gain control of his breathing and pounding heart. MENA even exclaimed “you sound like my wife.”

38. MENA just watched OUFKIR for the duration of the episode that was caused by MENA, exacerbated by MENA, and brought MENA to laughter. All of the while, MENA did not take any positive action to help OUFKIR, did not call for assistance for OUFKIR, did not try to get OUFKIR’s medications, and did not call for emergency services. MENA, in his capacity as Manager, as a human being, intentionally continued his assault upon OUFKIR which was brought on and caused by MENA's actions while he just stood there and laughed and then laughed more while OUFKIR feared for his life.

39. MENA exposed his hatred, intimidation, contempt, ridicule, in a mean and hateful childlike behavior but with adult intentions, cruelly and ignorantly yelling at OUFKIR and calling him a "schizophrenic" with actual knowledge that OUFKIR did not suffer this condition. MENA's attacks against OUFKIR can only be described as a "sociopath-like" desire to cause pain, suffering, emotional distress, and perhaps even death for absolutely no reason or cause, all while MENA was watched every minute of hell, despair, fear and panic while OUFKIR begged MENA with his eyes to stop but he wouldn’t.

40. MENA was supposed to have regularly scheduled “connection meetings” with the team members of the call centers. During one “connection meeting” between these two men only, OUFKIR asked MENA why he singled him out and treated him differently than the other team members. MENA would not respond. OUFKIR then asked MENA what he would need to do to be promoted. MENA glared at OUFKIR for many seconds and then responded that the only

way he would ever get promoted at COMCAST was if he “started talking American” and then left the room.

41. Over the following couple of months, the near constant and consistent heckling, taunting, abuse, harassment and discrimination by MENA towards OUFKIR continued. OUFKIR would not allow it to break his dedication or loyalty. OUFKIR kept giving 150% to COMCAST. He would not allow it to affect his work, but it was affecting him physically and emotionally and was taking a toll on his family.

42. OUFKIR had tried to talk with MENA without success so he decided to take this matter over his head. OUFKIR went to Senior Director TERHUNE to seek help and assistance.

43. OUFKIR told TERHUNE about the assault and verbal abuse, the heinous cruelty, failure to seek reasonable medical assistance, the racial and religious slurs, etc. OUFKIR reasonably expected that TERHUNE would take the necessary actions to document and pursue an investigation into OUFKIR's claims against MENA. After all, OUFKIR’s allegations against MENA were not minor claims of harassment, discrimination, acts of hate, racism, etc., OUFKIR’s allegations included real life dangers, real life threats, and real-life possibility of death or permanent physical and mental damage to OUFKIR.

44. Even though COMCAST represents that it has an "open door policy" that protects the anonymity of any complainant, OUFKIR was failed by TERHUNE and failed by COMCAST. TERHUNE did not take any action regarding OUFKIR’s allegations. TERHUNE did not initiate a complaint. TERHUNE did not report OUFKIR’s allegations. TERHUNE did not start an investigation as to OUFKIR’s allegations. TERHUNE did not take any steps to protect OUFKIR by keeping his anonymity from MENA.

45. To the contrary, TERHUNE, JOHN DOES, and superiors at COMCAST openly shared with MENA the verbal complaint that OUFKIR had lodged with TERHUNE, which only caused MENA to intensify the harassing, discriminating, intimidating, assaults and open displays of hatred and cruelty towards OUFKIR.

46. TERHUNE failed to report this complaint to Human Resources and failed to advise OUFKIR to report these incidents to Human Resources. OUFKIR reasonably believed that reporting these incidents to TERHUNE was initiating a complaint against MENA, but it wasn't and TERHUNE and COMCAST knew and should have known that they failed to take any steps towards correcting and preventing MENA from this unlawful conduct. OUFKIR was unaware and remained unaware of TERHUNE and COMCAST's failure to initiate a complaint, failed to investigate, failed to report findings that were never investigated, and failed to report and advise Human Resources.

47. OUFKIR did not become aware of TERHUNE and COMCAST's serious failings to take any action against a particularly heinous, cruel, criminal and civil assault, while knowing that it continued is evidence that TERHUNE and COMCAST condoned MENA's actions of hate crimes against OUFKIR.

48. During another "connection meeting" between these two men, OUFKIR pointedly asked MENA “did I do something to make you hate me or get mad at me?” MENA sat quietly for several minutes and then told OUFKIR “it’s because you went behind my back and complained to the Director [TERHUNE].” OUFKIR responded that he had asked MENA many times to stop the way he talks and treats him because it causes OUFKIR to have cause severe emotional distress, depression, stress and panic attacks. MENA then threatened OUFKIR that "[he] had

better watch what he says," or he will be like Christian Cataldo" (an employee whom MENA fired in summer of 2017).

49. For 8 months prior to his termination, MENA and his directors decided to turn up the heat on OUFKIR and change his duties and obligations to further intensify harassment, discrimination, intimidation, hatred, cruelty because of OUFKIR's nationality, race, religion, age, and disabilities.

50. OUFKIR had been assigned to Comcast's office at 1255 W. North Avenue, Chicago. As all employees of COMCAST in the position of Client Service 2 Representative, OUFKIR was assigned a company car to use only for company purposes. This meant that company car assigned to OUFKIR would remain at his office company parking lot outside of business hours.

51. OUFKIR lives about ten (10) miles from his office so would rely upon public transportation or his own vehicle to travel back and forth from work. OUFKIR was aware that MENA allowed some of his team members to use their assigned company cars outside of business hours, but MENA would not allow this for OUFKIR. MENA always treated OUFKIR differently than the other employees, and not in a positive sense ever.

52. OUFKIR would on occasion be temporarily assigned as a support backup for the Oak Brook, Schaumburg, Tinley Park, and Elmhurst call centers. Some of these locations had more than one Client Service 2 Representative assigned to it; OUFKIR's location did not. What started out as an occasional assignment to backup one of the other call centers soon became assignments 4 days a week to support the other sites, leaving only 1 day a week to support his own assigned call center. OUFKIR was also the eldest of the Client Service 2 Representatives

and the only one that was to be burdened with MENA's and COMCAST's new assignment changes.

53. MENA and the team members of the call centers met for a group connection meeting. During this meeting, MENA was asked to clarify for the team members whether there would be any change to the current responsibility structure for the call centers now that support members were helping to cover call centers other than their own. MENA explained that the team members assigned to their particular call centers would remain the responsible team member in charge of their call centers.

54. On the rare occasion that one of the other team members needed to be reassigned to a different call center for the following day, MENA allowed the team member to drive his assigned vehicle home the previous night, so he would have it in the morning to travel to the other call center. MENA would allow the "American" team members to take their assigned vehicles home. The following morning, the "Americans" would leave for their reassigned call center for that day from their homes, which was much more effective and efficient but against COMCAST policy. This method was against policy but alleviated a tremendous amount of time that was spent backtracking in rush hour traffic which assisted the team members with more prompt attendance and service. It also greatly reduced their stress of arriving late to work and then written up for being tardy. In addition, prompt attendance by the team members reflected positively on MENA as his team looked well managed, efficient and effective. MENA, however, would not provide this same accommodation to OUFKIR. Every other team member was allowed this accommodation by MENA except OUFKIR.

55. MENA chose to strictly apply and enforce these onerous policies only against OUFKIR, while also subjecting OUFKIR, the eldest of the team, to the most physically and mentally demanding, grueling and rigorous schedule of unannounced schedules until 7:00 a.m. each morning. MENA would call OUFKIR usually four out of every five business days at 7:00 a.m. with the location of the call center that he was due that day to be at by 8:00 a.m. OUFKIR was never told in advance of his daily assignment location until MENA called him each morning about 7:00 a.m. The other team members continued to maintain their consistent 5 day a week schedule at their regularly assigned call centers, with a rare reassignment now and then.

56. Due to the logistics and the last-minute changes in schedules and MENA's mandated check in time of 8:00 a.m. it became physically impossible for OUFKIR to get to any of the call centers by 8:00 a.m. unless he used his own car and left his own home by 7:00 a.m. For example, if MENA called at 7:00 a.m. and told OUFKIR he was needed at the Schaumburg call center, under COMCAST policy, OUFKIR was then drive the 10 miles to North Avenue call center from his home, get into his assigned car and drive the 40 miles north to Schaumburg where he was to report for work by 8:00 a.m. Anyone familiar with Chicago rush hour traffic knows that this is not physically possible. MENA was well aware that these last-minute reassignments to support other call centers were logistically impossible for OUFKIR or anyone for that matter.

57. Several times, OUFKIR asked MENA to allow him the same courtesies that he extended to the other team members and allow him to drive his assigned company car home which would save a great deal of time in the morning, MENA would respond that he had better "chop, chop. If you don't want to work, you can quit." OUFKIR didn't ask again.

58. OUFKIR internalized this heinous and cruel treatment he was receiving. It affected his wife and nearly ruined their 20 years of marriage. It affected his teenage children. His wife and

children were afraid to talk to him. They were afraid to say anything for fear that it would cause an outburst of anger by OUFKIR. It affected OUFKIR; his health, his depression, his anxiety. It was difficult for OUFKIR to sleep because his brain would not shut off. When he was able to sleep, he would wake up from the nightmares. OUFKIR isolated from his family and loved ones. He would sit alone in the cold dark basement in the evenings after work not connecting to anyone. OUFKIR spiraled into a deeper and darker depression. OUFKIR's stress, panic and anxiety attacks while at work continue to worsen horribly. Throughout all of this time, OUFKIR continued to seek treatment for his diagnosed medical conditions. His doctors prescribed increases in certain medications and also prescribed new medications.

59. OUFKIR had no choice but to use his personal car for COMCAST business because MENA's demands where otherwise impossible. OUFKIR submitted expense reports to MENA for reimbursement for gasoline that OUFKIR used in his personal vehicle for work, for mileage put on his personal vehicle while working, or even a stipend for wear and tear on his personal vehicle for attending to COMCAST business. These expense reports were valid, accurate, and due and owing to OUFKIR because he had to use his personal car to travel for work which he would not have had to use but for MENA's harassment, discrimination, and refusal to allow OUFKIR with the same or similar accommodations for travel related work that MENA provided the rest of the team.

60. OUFKIR also requested to be paid overtime when he did work overtime. MENA laughed, wadded the time sheet form, and OUFKIR never saw it again and never saw ANY reimbursement for these personal expenses in his paycheck. In fact, OUFKIR's car was driven so many miles and suffered so much wear and tear while conducting business on behalf of COMCAST that the car's engine blew and now needs to be replaced which will cost about

$9,000.00. Because MENA and COMCAST harassed and discriminated against OUFKIR and only allowed "real Americans" with reasonable use of their assigned cars, OUFKIR, a real American Muslim citizen with a foreign accent, had to use his own vehicle if he wanted to work and incur all of the additional expenses, wear and tear on his vehicles, replacement engine of $9,000.00, uncompensated overtime and out-of-pocket costs. MENA, oblivious or disregarding, refused to approve payment of these sums due OUFKIR pursuant to the Illinois Wage and Payment Act.

61. While OUFKIR was supporting 4 other call centers each week, he couldn't help but notice how his team members did not follow COMCAST protocol for the call centers. The Client Service 2 Representatives, specifically at the Oak Brook, Schaumburg, Tinley Park, and Elmhurst call centers, did not all follow the same strict and compliant inventory reporting methods on the Ercent database that he did and as COMCAST demanded. He noticed that from month to month, there were often no changes to the inventory listed in the Ercent database which clearly meant that the inventory was not being tracked or that the inventory was never moving. OUFKIR knew that the lack of organization at the various call centers and the lack of proper inventory tracking on any equipment coming back in to COMCAST, equipment that was deployed and reassigned, and equipment that was disposed of could only mean one thing - the equipment was not being properly inventoried or properly tracked in the Ercent database.

62. Suspecting that he would become the fall guy, OUFKIR mentioned to MENA that he was concerned, and he wanted to make sure he was not responsible for any missing equipment. MENA’s response was “It is not your job. Everyone is responsible for their own inventory. So, don’t worry about it.”

63. Still suspicious, OUFKIR started documenting his findings and taking photos of the condition of the call centers, the equipment all over the place, and the total disorganization of the call centers. OUFKIR reported his findings to MENA and also forwarded MENA the photos. At his North Avenue call center, OUFKIR always had kept his facility in good orderly condition and kept detailed inventory of all equipment that was returned and kept in the Ercent database current. He reported what specific equipment was then deployed and reassigned and what equipment was being disposed. A review of OUFKIR's reports from his North Avenue call center would reflect accurate reporting of equipment that was returned, deployed and reassigned, and the equipment that was disposed. The reports from one month to the next would reflect this flow of equipment returned, deployed and reassigned and disposed.

64. OUFKIR agonized over the way that MENA and COMCAST treated him like garbage to be tossed out with the trash. His nerves were shot. He couldn't/didn't feel like eating. His medical condition continued to worsen. His anxiety sky-rocketed and depression plummeted. OUFKIR could not make sense of this. He isolated. On days off, he often could not get out of bed. Other days, he dragged himself to the dark basement. He "checked" out of his family. He started to think, to believe that maybe there was something wrong with him and that he deserved the way MENA and COMCAST treated him. Maybe he really has the "a**hole" and "loser" that MENA told him he was. He was so stressed and distraught that he even started smoking cigarettes to ease the pressure.

65. On October 25, 2017, non-party, Adrienne Greaves, Division Director, Human Resources CDO/Shared Services, COMCAST – Central Division, 600 Galleria Parkway, Suite 1100, Atlanta, Georgia, 30339, office number (678) 385-5110 ("GREAVES") sent out an email to COMCAST employees to remind that "the year end is quickly approaching, and now is a great

time to work with your manager and schedule time to complete any assigned mandatory training courses for 2017" which must be completed by "11:59 pm (EST) on Sunday, December 24, 2017, in order to be complaint." A true and correct copy of this email from GREAVES is attached hereto and incorporated herein as Group Exhibit "C".

66. Upon receipt of this email, OUFKIR telephoned GREAVES and left a voicemail message.

67. Later that day when OUFKIR had not received a return telephone call from GREAVES, he sent a follow-up email to her again requesting advice regarding his "health situation, I have anxiety, depression and ADHD." OUFKIR further reported that his "Director want[s] [him] to report it to HR to document it on [his] files." A true and correct copy of OUFKIR's email is attached and incorporated as part of Group Exhibit "C". OUFKIR further asked GREAVES "how [he] can make that happen."

68. Within about ten (10) minutes, GREAVES responded to OUFKIR via email and advised him that non-party, "Ezra Lott, Sr HR Manager, will be able to assist [him] with his next steps" ("LOTT") and sent carbon copy of email to same. See Group Exhibit "C".

69. On October 26, 2017, LOTT emailed OUFKIR and advised OUFKIR that "for health-related concerns or workplace accommodations you'll need to reach out to Sedgwick at 1-855-473-7830, they'll be able to assist to with respect to your needs." See Group Exhibit "C". Sedgwick Claims Management ("SEDGWICK") was COMCAST's outsourcing agent for processing human resource related matters. OUFKIR was considering taking some leave from work and wanted to look into the Federal Medical Leave Act (FMLA"). Work had taken such a toll on OUFKIR on him and his family, but OUFKIR was conflicted because of his strong work

ethic; another conflict to add in to the numerous conflicts he was already trying to deal with every day.

70. On November 17, 2017, OUFKIR was working an overnight shift when he received a devastating phone call that his mother had been taken to the emergency room. OUFKIR knew that he could not call MENA in the middle of the night to ask if he could leave to go and be with his mother, so he suffered through to the end of that shift. OUFKIR had to tell MENA that he needed to request the following night off so that he could be with his mother. In OUFKIR's culture, this is the son’s responsibility. He advised MENA of the situation and that he would need to take the following night off to help his mother.

71. Although MENA approved his request, OUFKIR was later told by a colleague, Kevin Hausen, that during the second night shift MENA was laughing and telling others, taunting OUFKIR’s culture which respects, honors and cares for their parents and elders, cruelly making fun of OUFKIR because he "had to be there for his Mommy.” OUFKIR was and is very proud and honored of his nationality. He is proud of the tenets for which it stands including but not limited to the honor, dignity and respect that is bestowed upon the elder family members and the elderly regardless of personal family ties. MENA’s attacks, assaults, and harassment, which MENA encouraged other COMCAST employees to participate, were so frequent and severe that it continued to keep a hostile and offensive work environment. This particular instance was even worse and more offensive and hostile than the “regular, daily” biased performances because MENA was directing this particular display of harassment, hatred, and hostility toward OUFKIR’s beloved mother whose medical condition remained serious.

72. Shortly after, COMCAST began an audit of the call centers. The North Avenue call center was audited, no equipment was missing, and the call center was well organized. All inventory in the Ercent database for OUFKIR's call center was identified and accounted for.

73. Shortly after, the Oakbrook call center was audited but Plaintiff has no knowledge as to the results of that audit.

74. The Schaumburg call center was audited but Plaintiff has no knowledge as to the results of that audit.

75. The Tinley Park call center was audited but Plaintiff has no knowledge as to the results of that audit.

76. The Elmhurst call center was audited. Allegedly, there was some missing equipment.

77. OUFKIR was never provided or shown the results from any of the audits or any information as to what kind of equipment was allegedly missing, how many pieces were allegedly missing, or even from where the supposedly equipment was missing.

78. Contrary to the numerous statements that MENA had made previously that each team member was responsible for their own call centers, MENA immediately accused OUFKIR of taking the equipment even though it was not OUFKIR's call center. MENA called OUFKIR into his office. He asked OUFKIR to "look in my eyes to see how pissed I am." OUFKIR knew that he was in for MENA's own theory of guilty unless proven innocent.

79. OUFKIR had advised MENA on so many occasions that MENA's change of OUFKIR's assignments to a different call center each day and the logistics involved made his job nearly impossible. An enormous part of OUFKIR's job description involved the management of the

call centers equipment. For example, if there was an issue or problem with an Oakbrook call center employee's laptop, a "ticket" would be issued from that location. The team member assigned to that call center was required to fix the issue within a specified time period and the "ticket" would then be closed. If the team member did not fix the equipment, or reassign new equipment, or deploy the new equipment out to the employee that same day from equipment that was in stock at that call center and close out the ticket within the time frame allotted, the team member would receive a negative mark against that team member's name. It was one method that COMCAST employed to track employees' productivity, efficiency and effectiveness. In theory, this is an understandable and perhaps even reasonable accounting.

80. This measure of tracking becomes very problematic however if you are the sole team member assigned to your permanent call center, but you are allowed only one day a week to be physically present at your call center and "tickets" are being issued every day at your call center. If a team member is assigned to various call centers 4 days a week and only one day a week at his permanent call center, it is not physically possible to travel back and forth from your permanent call center to your daily assigned call centers to solve the "ticket" issues from equipment in inventory from that site. OUFKIR attempted to tell MENA of these issues but MENA refused to listen to OUFKIR.

81. There was a resolution to this problem that was really only OUFKIR's problem because he was the only one singled out from all of the other team members that was assigned to a different call center each day. OUFKIR shared his brilliant idea with MENA who responded as he usually always does to OUFKIR with some racial and religious slurs, words of hate, insinuate that he is just an old Moroccan Muslim, or a variety of negative slang.

82. OUFKIR's solution to "his" issue was to inventory and check out equipment at Schaumburg (for example) where he was located that day with the ticket that was issued from North Avenue (for example). Find a piece of equipment in Schaumburg, test it out, inventory it, re-assign it, and deploy it in COMCAST mail to be received at North Avenue the next day. Problem solved, Schaumburg gets some organization from OUFKIR's assistance, and the employee at North Avenue receives the equipment that was not working prior. Ticket closed!!

83. MENA didn't like this idea. It was way too effective and efficient and went against MENA's goals which was to get rid of the old Moroccan Muslim who doesn't speak 'American" which many people would likely contrast that school of thought with a middle-aged American husband and father with a great accent that he acquired from traveling the world and all of the stories of those travels.

84. OUFKIR told MENA that the evidence of the equipment that he handled is contained in the Ercent database. OUFKIR kept track of the equipment that was relocated. The problem, as OUFKIR had reported before, was that the other call centers were not consistently reporting the inventory of assets as reflected in the monthly inventory reports. It was as circular of an argument as they all were; but OUFKIR was the guilty thief because he was a ~~Witch from Salem~~ an older Moroccan Muslim man with an accent.

85. On November 30, 2017, while OUFKIR was at his primary call center at 1255 W. North Avenue, Chicago, MENA told OUFKIR that there were people downstairs that needed their computers fixed. OUFKIR asked if he could finish the task he was working on, but MENA told him to "get [his] a** there now." At about 12:00, OUFKIR was led to a small interior office without windows. KYLE was the Director of Security for COMCAST and in charge of the

investigations. Inside the office were two investigators, BEJAR from Tinley Park and SIMPSON from Elmhurst. From what OUFKIR had heard from his team members, they were each interrogated by one investigator for about fifteen (15) minutes. OUFKIR did not have a good feeling about this. It was clear from the outset of questioning that KYLE, BEJAR, and SIMPSON had agreed with MENA's theory of guilty until proven innocent regardless that the **alleged MISSING EQUIPMENT WAS NEVER** identified to OUFKIR. He was guilty of stealing the missing equipment even though there was never any actual equipment ever identified as "missing." Shortly after the questioning began, OUFKIR's level of distress, panic and anxiety started to elevate. He asked to go to his desk to get one of the newer medications that his doctor prescribed for anxiety for his stress and anxiety attacks. They permitted him to get the medication. OUFKIR took one dose upon returning to the interrogation. He was not provided with any water or other beverage to swallow his medication. The barrage of questioning and accusations of theft continued. OUFKIR was being interrogated by these two investigators as viciously as someone who had committed a capital crime. They were breathing down his neck. Their faces less than ½" from OUFKIR's at times.

86. They ratcheted up the interrogation. They increased the stress. They were in his face, then behind him, then next to him. The questioning was ceaseless. They would not stop, they would not pause. OUFKIR's panic, stress and anxiety attack just kept building and building. His heart pounding harder and faster. The streams of sweat running down his face and neck were now more like rivers. Without a doubt, MENA had fully informed COMCAST and its security team about OUFKIR's medical condition and how he had used it in the past.

87. Although this interrogation was taking place at OUFKIR's primary call center where his assigned company was parked in the COMCAST parking lot on site, the investigators never asked OUFKIR if they could search the company car parked in the lot outside.

88. Rather, the investigators demanded to search OUFKIR’s personal vehicle. He explained that his car was in the shop out near Oak Park, IL, at the time. They did not believe him. They demanded the name of the shop and the phone number. OUFKIR was mortified, embarrassed and humiliated by this demand. This had been his repair shop and his mechanic for nearly 20 years. OUFKIR’s anxiety attack continued out of control so he took another pill, again without a sip of water. OUFKIR had now been in this interrogation for over 2 hours and watched him take two pills without anything to drink, but just swallow his medication forcing it down his parched throat. They demanded that OUFKIR call his mechanic. On speaker, they demanded that OUFKIR ask his mechanic to search his car to see if there was any Comcast equipment in the vehicle. His mechanic searched and car and reported that there was no Comcast equipment. The investigators then demanded that the mechanic search OUFKIR’s trunk. OUFKIR’s trunk was broken and the only way to search his trunk was for his mechanic to break into the trunk through the back seat of the car to get into the car. He literally had to remove the back seat to search the trunk. Absolutely no Comcast equipment was found by the mechanic at the repair shop who removed the back seat and climbed into the broken trunk to search OUFKIR’s personal car so that these investigators were satisfied with this outrageous search. There was no equipment found that OUFKIR alleged to have stolen from the Elmhurst call center and there was absolutely no equipment even alleged missing from OUFKIR’s primary call center. AND THERE was still no list or report that allegedly contained a listing of the missing equipment.

89. It was now nearly three (3) hours of interrogation by two investigators looking for missing equipment that had not even been identified as missing! Yet still, COMCAST was not satisfied with these results which clearly exonerated OUFKIR, so they kept attacking him with question after question, with allegation after allegation in a room that was 6'x6' with no windows, 3 hours of no food or water, barely a moment for rest room breakroom. OUFKIR needed to take another pill because he was near collapse from the extreme conditions and extreme suffering of this stress, panic and anxiety attack for 3 hours. He forced down another pill, forced it down his parched throat. His attacks were out of control, his heart beating out of his chest, sweat was dripping from his face, yet the unfounded attack by the investigators continued.

90. The stress, the strain, the hunger, the thirst, and worst of all the panic attacks that OUFKIR continued to endure over the course of these 4 hours caused him to take at least another 4 tablets of the 300 MG Gabapentin, which was witnessed by the investigators. OUFKIR was suffering from such intense panic attacks that he was not even aware of how many pills he had taken but it appears that OUFKIR had taken 4 or 5 during the 4 1/2-hour interrogation which far exceeds his prescribed dose for an entire day. But OUFKIR can't be sure because of the relentless punishing questions, the intimidation, the perceived physical threats, the brutal and hateful accusations and the resulting extreme stress and panic attacks.

91. As point of reference, OUFKIR was prescribed the anti-anxiety drug Gabapentin 300 MG, to be taken by mouth up to 4 times per day as needed for panic attacks. At this point in time, it appears that OUFKIR has taken 4 or 5 doses in a 4-hour period of time. A Google search of side effects that may be caused from this medication TAKEN AS PRESCRIBED includes, but is not limited to side effects as such slow thinking, can cause trouble with thinking,

slow motor skills, can cause drowsiness and dizziness, blurred vision, delusions, clumsiness or unsteadiness, trembling or shaking, lack or loss of strength, burning, dry, or itching eyes, change in vision, change in walking and balance, tingling in the hands and feet, and weakness or loss of strength, just to name a few side effects. One wonders what the effects are to OUFKIR if he has taken 4 or 5 doses in 4 hours, which is about 5 times the recommended dose.

92. OUFKIR could not handle being subjected to such intimidating, threatening, hateful, harassing interrogation techniques any longer. OUFKIR was dizzy, thirty, hungry, tired, abused, threatened, accused, humiliated, he could not even think straight after 4 hours of interrogation and all of the medication he took, without water. The stress eventually got to him. At one point, the investigators even asked OUFKIR if they should call 911. Five (5) seconds later the period of concern over OUFKIR's well-being vanished. They refused to allow him to make a call. Toward the end of the interview when OUFKIR was beaten down and tired, he asked if he could call a lawyer. The investigators would not allow OUFKIR to call his attorney.

93. Shortly thereafter, the investigators called KYLE. The investigators but the phone on speaker so that OUFKIR could speak to KYLE. He told KYLE that he "had been harassed and discriminated against by these guys. I didn't do anything wrong." KYLE did not even respond to OUFKIR, she just hung up the phone.

94. Apparently, the investigators realized that they had pushed OUFKIR past his physical and mental brink, and immediately at 4:00 p.m. they presented him Comcast Central Division Security, Official Written Statement (Addendum). The investigators had him sign a written statement which comprised of such contradictory language it is non-sensical. The form statement required OUFKIR place his initials next to the statement which states:

**"This statement is being given freely and without coercion. I further acknowledge that I am not under the influence of any alcohol drugs, prescription or any substance that would alter my ability to understand the questions presented today." _ Initials "SO"**

A true and correct copy of Comcast Central Division Security, Official Written Statement Addendum) dated November 30, 2017, and executed by OUFKIR and witnessed by SIMPSON is attached hereto and incorporated herein as Exhibit "D".

95. OUFKIR could no longer continue to subject himself to such gruel and inhuman treatment. He thought he had three (3) choices at this point: 1.) continue to fight for the truth and his innocence; 2.) to die fighting for his innocence; or 3.) capitulate to their false accusations and demands so he could at least he might live and be with his loved ones and friends. Not great choices. And never in a million years did OUFKIR ever imagine or consider that his 17 years of dedication, service, loyalty, and admiration for a company he once treasured would end like this. One thing was for sure, OUFKIR was not going to stick around to see how COMCAST celebrates 18 years of service!

96. The investigators gave OUFKIR "confession" language to write that is like language that one might hear from a prisoner of war tortured by water-boarding on an episode of Homeland. "I have learned my lesson now." "I have learned my mistake. I will never make the same [illegible] mistake [illegible] right now every item [are] been record it in Ercent for my area." Even with his distorted and confused thinking, OUFKIR tried to make it clear that "I feel been violated to tell the thru." [I feel like I am being violated. I am telling the truth.] "I was doing my job as Cesar [MENA] ask to support Elmhurst."

97. After 4 ½ hours held in a claustrophobic room, with a security director skilled in the controversial "Reid Technique of Interviewing and Interrogation" (see LinkedIn Profile for KYLE) and likely her team, no food or water offered to OUFKIR, ingesting an excessive amount if not an overdose amount of anxiety pills he forced down his dry throat, while repeating accusations of his guilt, the presentation of evidence – real or invented – and the slow 4 ½ hour build of pressure that makes admitting a crime seem like the easiest way out. A typical police interrogation method that many law enforcement agencies are no longer using because of the large risk of false confessions. See Exhibit "E" attached hereto and incorporated herein. But OUFKIR was not being questioned by nor had he been charged by any law enforcement agency, rather just a 4 ½ hour "interview" by the security department of the company that he had worked at for 17 years!

98. After the 4 ½ hour "interview", the 50 year old devoted husband of 20 years, father of 2 teenagers, son, brother, friend to many, American citizen, born in Morocco but raised mostly in France, devout Muslim, who had been battered and bruised, intimidated, subjected to hate crimes and intentional infliction of emotional distress, harassed and discriminated because of his nationality, his race, his religion, his age, his disabilities, subjected to disorderly conduct, violated by COMCAST's failure and refusal to pay his wages and other legitimate business expenses, OUFKIR went back to work day after day and continued to work like a dog because that was his work ethic, his dedication, his moral obligation to himself and his family and even to COMCAST.

99. OUFKIR realized though that this traumatic event that he had been going through for the past two (2) years resulted in some additional serious health concerns and he looked more seriously at taking some leave under the FMLA.

100. OUFKIR submitted his request for unpaid leave under the FMLA to SEDGWICK, COMCAST's agent for these types of human resources claims because of "serious health conditions that made it unable to perform the functions of his position" which was caused by each and every Defendant named in this Complaint; COMCAST, MENA, TERHUNE, SIMPSON, BEJAR, KYLE, CRAIG, BRYANT, and CONNORS. MENA, and likely other Defendants, was aware of OUFKIR's request.

101. On December 19, 2017, OUFKIR received Notice from SEDGWICK that his request had been reviewed and it was determined that he met the FMLA's eligibility requirements. A true and correct copy of this Notice is attached hereto and incorporated herein as Exhibit "F". SEDGWICK requested OUFKIR's health provider complete the Medical Certification form and return it by January 7, 2017. A true and correct copy of Medical Certification is attached hereto and incorporated herein as Exhibit "G".

102. On December 22, 2017, OUFKIR was terminated from his 17-year employment with COMCAST. A true and correct copy of Termination Notice is attached hereto and incorporated herein as Exhibit "H". Prior to and at the time of his termination, MENA and COMCAST were aware that OUFKIR had requested FMLA lease of absence and that OUFKIR was entitled to FMLA benefits and obviously that he suffered from a serious health condition given that MENA and COMCAST were two of the primary sources that caused the serious health condition. OUFKIR provided sufficient notice of his intent to take leave due to the serious health conditions he suffered as a result of MENA and COMCAST. COMCAST was covered by FMLA. MENA and COMCAST interfered with OUFKIR's FMLA benefits and retaliated by terminating his employment and thus deny him FMLA benefits to which he was entitled.

103. OUFKIR directed an email to several directors and officers, specifically CRAIG, BRYANT and CONNORS, of COMCAST to advise them of the horrid events of the past two years, identified numerous gross errors that COMCAST failed to acknowledge and/or admit, COMCAST's failures and refusal to address any of the numerous matters that OUFKIR identified in his email, OUFKIR attempted to make them aware of some of the gross mis-management, cruelty, harassment, discrimination, the hate crimes, the intentional harm that so many COMCAST employees continued to daily subject upon OUFKIR. But no one, not CRAIG, not BRYANT, not even CONNORS bothered to even investigate or respond to OUFKIR's claims. They have therefore under the doctrine of respondeat superior caused COMCAST to be liable for all of the acts of COMCAST's employee and agents.

104. Since OUFKIR was terminated from COMCAST, he has continued to seek treatment for the damages caused to him. He has also now been diagnosed with Post Traumatic Post Disorder. A true and correct of this diagnosis is attached hereto and incorporated herein as Exhibit "I".

**COUNT I - VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

**NATIONAL ORIGIN DISCRIMINATION**

105. Plaintiff incorporates by reference paragraphs 1 – 104 as if fully set forth herein.

106. In direct violation of the Civil rights Act of 1964, as amended 42 U.S.C. §1981 and §1983. COMCAST engaged in the discriminatory acts based upon Plaintiff's national origin as alleged herein and arising out of and related to, the Charge of Discrimination attached hereto as Exhibit "A" and incorporated herein by reference.

107. As a direct result of COMCAST's discriminatory conduct towards Plaintiff's national origin, as foresaid, Plaintiff suffered injury to his career, as well as other injuries for which he is

entitled to actual, compensatory and punitive damages, as well as equitable relief, pursuant to the Civil Rights Act of 1964.

108. COMCAST's discriminatory conduct against Plaintiff's national origin, as alleged herein, was done with malice and/or reckless indifference to the Plaintiff's rights.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST intentionally violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981 and §1983;

B. Making Plaintiff whole by paying for lost back pay, employee benefits, retirements benefits, liquidated and punitive damages;

C. For attorney's fees and costs of this suit, including expert witness fees;

D. For pre-judgment interest in an amount to be determined at the time of trial; and

E. For such further legal and equitable relief as this Court deems just.

## COUNT II - VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 RACE DISCRIMINATION

109. Plaintiff incorporates by reference paragraphs 1 – 108 as if fully set forth herein.

110. In direct violation of the Civil rights Act of 1964, as amended 42 U.S.C. §1981 and §1983. COMCAST engaged in the discriminatory acts based upon Plaintiff's race as alleged herein and arising out of and related to, the Charge of Discrimination attached hereto as Exhibit "A" and incorporated herein by reference.

111. As a direct result of COMCAST's discriminatory conduct towards Plaintiff's race, as foresaid, Plaintiff suffered injury to his career, as well as other injuries for which he is entitled to

actual, compensatory and punitive damages, as well as equitable relief, pursuant to the Civil Rights Act of 1964.

112. COMCAST's discriminatory conduct against Plaintiff's race, as alleged herein, was done with malice and/or reckless indifference to the Plaintiff's rights.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST intentionally violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981 and §1983 et. seq.;

B. Making Plaintiff whole by paying for lost back pay, employee benefits, retirements benefits, liquidated and punitive damages;

C. For attorney's fees and costs of this suit, including expert witness fees;

D. For pre-judgment interest in an amount to be determined at the time of trial; and

E. For such further legal and equitable relief as this Court deems just.

## <u>COUNT III - VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 RELIGIOUS DISCRIMINATION</u>

113. Plaintiff incorporates by reference paragraphs 1 – 112 as if fully set forth herein.

114. In direct violation of the Civil Rights Act of 1964, 42 U.S.C. §1981 and §1983, COMCAST engaged in the discriminatory acts based upon Plaintiff's religion as alleged herein and arising out of and related to, the Charge of Discrimination attached hereto as Exhibit "A" and incorporated herein by reference.

115. As a direct result of COMCAST's discriminatory conduct towards Plaintiff's religion, as foresaid, Plaintiff suffered injury to his career, as well as other injuries for which he is entitled to actual, compensatory and punitive damages, as well as equitable relief, pursuant to the Civil Rights Act of 1964.

116. COMCAST's discriminatory conduct against Plaintiff's religion, as alleged herein, was done with malice and/or reckless indifference to the Plaintiff's rights.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST intentionally violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981 and §1983;

B. Making Plaintiff whole by paying for lost back pay, employee benefits, retirements benefits, liquidated and punitive damages;

C. For attorney's fees and costs of this suit, including expert witness fees;

D. For pre-judgment interest in an amount to be determined at the time of trial; and

E. For such further legal and equitable relief as this Court deems just.

**COUNT IV - VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT**

117. Plaintiff incorporates by reference paragraphs 1 – 116 as if fully set forth herein.

118. In direct violation of the Civil Rights Act of 1964, 29 U.S.C. §621, et seq., COMCAST engaged in the discriminatory acts based upon Plaintiff's age as alleged herein and arising out of and related to, the Charge of Discrimination attached hereto as Exhibit "A" and incorporated herein by reference.

119. As a direct result of COMCAST's discriminatory conduct towards Plaintiff's age, as foresaid, Plaintiff suffered injury to his career, as well as other injuries for which he is entitled to actual, compensatory and punitive damages, as well as equitable relief, pursuant to the Civil Rights Act of 1964.

120. COMCAST's discriminatory conduct against Plaintiff's age, as alleged herein, was done with malice and/or reckless indifference to the Plaintiff's rights.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST intentionally violated Title VII of the Civil Rights Act of 1964, 29 U.S.C. §621 et. seq.;

B. Making Plaintiff whole by paying for lost back pay, employee benefits, retirements benefits, liquidated and punitive damages;

C. For attorney's fees and costs of this suit, including expert witness fees;

D. For pre-judgment interest in an amount to be determined at the time of trial; and

E. For such further legal and equitable relief as this Court deems just.

**COUNT V - VIOLATIONS OF AMERICAN WITH DISABILITIES ACT**

121. Plaintiff incorporates by reference paragraphs 1 – 120 as if fully set forth herein.

122. In direct violation of The American with Disabilities Act, 42 U.S.C. §§12101, et seq., COMCAST engaged in violations due to disabilities which resulted in discriminatory acts based upon Plaintiff as alleged herein and arising out of and related to, the Charge of Discrimination attached hereto as Exhibit "A" and incorporated herein by reference.

123. As a direct result of COMCAST's violations due to disabilities of the Plaintiff, as foresaid, Plaintiff has suffered injury to his career, as well as other injuries for which he is entitled to actual, compensatory and punitive damages, as well as equitable relief, pursuant to The American with Disabilities Act.

124. COMCAST's violations against Plaintiff's disabilities, as alleged herein, was done with malice and/or reckless indifference to the Plaintiff's rights.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST intentionally violated The American with Disabilities Act, as amended, 42 U.S.C. §§12101 et. seq.;

B. Making Plaintiff whole by paying for lost back pay, employee benefits, retirements benefits, liquidated and punitive damages;

C. For attorney's fees and costs of this suit, including expert witness fees;

D. For pre-judgment interest in an amount to be determined at the time of trial; and

E. For such further legal and equitable relief as this Court deems just.

**<u>COUNT VI – VIOLATION OF FAMILY MEDICAL LEAVE ACT</u>**

125. Plaintiff incorporates by reference paragraphs 1 – 124 as if fully set forth herein.

126. In direct violation of the Family Medical Leave Action, 29 U.S.C. §§2600 et. seq. ("FMLA") COMCAST, MENA, TERHUNE, CRAIN, BRYANT, CONNOR, and JOHN DOES

interfere with, restrained, or denied the exercise of or the attempt to exercise, any right provided pursuant to 29 U.S.C. §2651(a)(1).

127. COMCAST, MENA, TERHUNE, CRAIN, BRYANT, CONNOR, and JOHN DOES deprived Plaintiff of his entitlement to the FMLA to which he was eligible for protections, COMCAST was covered by FMLA, Plaintiff provided sufficient notice, and Plaintiff was denied. Plaintiff suffered injury to his career, as well as other injuries for which he is entitled to actual, liquidated and compensatory damages, as well as equitable relief, pursuant to the FMLA.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST intentionally violated Family Medical Leave Action, 29 U.S.C. §§2600 et. seq.;

B. Making Plaintiff whole by paying for lost back pay, employee benefits, retirements benefits, liquidated and compensatory damages;

C. For attorney's fees and costs of this suit, including expert witness fees;

D. For pre-judgment interest in an amount to be determined at the time of trial; and

E. For such further legal and equitable relief as this Court deems just.

**COUNT VII – VIOLATION OF FAMILY MEDICAL LEAVE ACT**

128. Plaintiff incorporates by reference paragraphs 1 – 127 as if fully set forth herein.

129. In direct violation of the Family Medical Leave Action, 29 U.S.C. §§2600 et. seq. ("FMLA") COMCAST, MENA, TERHUNE, CRAIN, BRYANT, CONNOR, and JOHN DOES retaliate against Plaintiff once he invoked his right to FMLA benefit, by terminating his

employment, and this action was taken once Plaintiff invoked and received approval of his rights. 29 U.S.C. §2651(a)(1).

130. COMCAST, MENA, TERHUNE, CRAIN, BRYANT, CONNOR, and JOHN DOES retaliate against Plaintiff and has suffered injury to his career, as well as other injuries for which he is entitled to actual, liquidated and compensatory damages, as well as equitable relief, pursuant to the FMLA.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST intentionally violated Family Medical Leave Action, 29 U.S.C. §§2600 et. seq.;

B. Making Plaintiff whole by paying for lost back pay, employee benefits, retirements benefits, liquidated and compensatory damages;

C. For attorney's fees and costs of this suit, including expert witness fees;

D. For pre-judgment interest in an amount to be determined at the time of trial; and

E. For such further legal and equitable relief as this Court deems just.

**COUNT VIII - INTIMIDATION PURSUANT TO 720 ILCS 5/12-6**

131. Plaintiff incorporates by reference paragraphs 1 – 130 as if fully set forth herein.

132. In direct violation of 720 ILCS 5/12-6, a person commits intimidation when, with the intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly by any means, a threat to perform without lawful authority, in

relevant part, (2) subject any person to physical confinement or restraint, (4) accuse any person of an offense, or (5) expose any personal to hatred, contempt, or ridicule.

133. Pursuant to 720 ILCS 5/12-7.1© any person suffering injury to his person, damage to his property, or intimidation, may bring a civil action for actual damages, including damages for emotional distress, and punitive damages. In addition, the Court may impose a civil penalty for up to $25,000.00 for each violation under this Section, and a judgment for attorney's fees and costs.

134. As a result of intimidation by COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES, against Plaintiff, judgment should be entered in favor of Plaintiff.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES are in violation of 720 ILCS 5/12-6;

B. Making Plaintiff whole by paying actual damages;

C. Making Plaintiff whole by paying damages for his emotional distress;

D. Making Plaintiff whole by awarding punitive damages against these Defendants and in favor of Plaintiff;

E. Making Plaintiff whole by imposing a civil penalty of $25,000.00 against each of these Defendants;

F. For attorney's fees and costs of this suit;

G. For such further legal and equitable relief as this Court deems just.

**COUNT IX - INTIMIDATION PURSUANT TO 720 ILCS 5/12-6**

135. Plaintiff incorporates by reference paragraphs 1 – 134 as if fully set forth herein.

136. In direct violation of 720 ILCS 5/12-6, a personal commits intimidation when, with the intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly by any means, a threat to perform without lawful authority, in relevant part, (2) subject any person to physical confinement or restraint, (4) accuse any person of an offense, or (5) expose any personal to hatred, contempt, or ridicule.

137. Pursuant to 720 ILCS 5/12-7.1 any person suffering injury to his person, damage to his property, or intimidation, may bring a civil action for actual damages, including damages for emotional distress, and punitive damages. In addition, the Court may impose a civil penalty for up to $25,000.00 for each violation under this Section, and a judgment for attorney's fees and costs.

138. As a result of subjecting the Plaintiff to physical confinement by COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES, against Plaintiff, judgment should be entered in favor of Plaintiff.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES are in violation of 720 ILCS 5/12-6;

B. Making Plaintiff whole by paying actual damages;

C. Making Plaintiff whole by paying damages for his emotional distress;

D. Making Plaintiff whole by awarding punitive damages against these Defendants and in favor of Plaintiff;

E. Making Plaintiff whole by imposing a civil penalty of $25,000.00 against each of these Defendants;

F. For attorney's fees and costs of this suit;

G. For such further legal and equitable relief as this Court deems just.

**COUNT X - INTIMIDATION PURSUANT TO 720 ILCS 5/12-6**

139. Plaintiff incorporates by reference paragraphs 1 – 139 as if fully set forth herein.

140. In direct violation of 720 ILCS 5/12-6, a person commits intimidation when, with the intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly by any means, a threat to perform without lawful authority, in relevant part, (2) subject any person to physical confinement or restraint, (4) accuse any person of an offense, or (5) expose any personal to hatred, contempt, or ridicule.

141. Pursuant to 720 ILCS 5/12-7.1 any person suffering injury to his person, damage to his property, or intimidation, may bring a civil action for actual damages, including damages for emotional distress, and punitive damages. In addition, the Court may impose a civil penalty for up to $25,000.00 for each violation under this Section, and a judgment for attorney's fees and costs.

142. As a result of accusing the Plaintiff of the offense of stealing by COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES, judgment should be entered in favor of Plaintiff.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES are in violation of 720 ILCS 5/12-6;

B. Making Plaintiff whole by paying actual damages;

C. Making Plaintiff whole by paying damages for his emotional distress;

D. Making Plaintiff whole by awarding punitive damages against these Defendants and in favor of Plaintiff;

E. Making Plaintiff whole by imposing a civil penalty of $25,000.00 against each of these Defendants;

F. For attorney's fees and costs of this suit;

G. For such further legal and equitable relief as this Court deems just.

**COUNT XI - INTIMIDATION PURSUANT TO 720 ILCS 5/12-6**

143. Plaintiff incorporates by reference paragraphs 1 – 142 as if fully set forth herein.

144. In direct violation of 720 ILCS 5/12-6, a person commits intimidation when, with the intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly by any means, a threat to perform without lawful authority, in relevant part, (2) subject any person to physical confinement or restraint, (4) accuse any person of an offense, or (5) expose any personal to hatred, contempt, or ridicule.

145. Pursuant to 720 ILCS 5/12-7.1 any person suffering injury to his person, damage to his property, or intimidation, may bring a civil action for actual damages, including damages for

emotional distress, and punitive damages. In addition, the Court may impose a civil penalty for up to $25,000.00 for each violation under this Section, and a judgment for attorney's fees and costs.

146. As a result of exposing Plaintiff to hatred, contempt or ridicule by COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES, judgment should be entered in favor of Plaintiff.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES are in violation of 720 ILCS 5/12-6;

B. Making Plaintiff whole by paying actual damages;

C. Making Plaintiff whole by paying damages for his emotional distress;

D. Making Plaintiff whole by awarding punitive damages against these Defendants and in favor of Plaintiff;

E. Making Plaintiff whole by imposing a civil penalty of $25,000.00 against each of these Defendants;

F. For attorney's fees and costs of this suit;

G. For such further legal and equitable relief as this Court deems just.

**COUNT XII – HATE CRIME PURSUANT TO 720 ILCS 5/12-7.1**

147. Plaintiff incorporates by reference paragraphs 1 – 146 as if fully set forth herein.

148. In direct violation of 720 ILCS 5/12-7.1(a), a person commits a hate crime by reason of the actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin of another individual or groups of individuals, regardless of the existence of any other motivating factor or factors, he or she commits assault, battery, aggravated assault, intimidation, stalking, cyberstalking, et. seq.

149. Pursuant to 720 ILCS 5/12-7.1(c) any person suffering injury to his person, damage to his property, or intimidation, as a result of a hate crime may bring a civil action for actual damages, including damages for emotional distress, and punitive damages. In addition, the Court may impose a civil penalty for up to $25,000.00 for each violation under this Section, and a judgment for attorney's fees and costs.

150. As a result of the deliberate and intentional hate crime against Plaintiff by COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES, judgment should be entered in favor of Plaintiff.

WHEREFORE, SAMIR OUFKIR, Plaintiff prays as follows:

A. A finding be entered that COMCAST, MENA, SIMPSON, BEJAR, KYLE CRAIG, BRYANT, CONNOR, AND JOHN DOES are in violation of 720 ILCS 5/12-7.1;

B. Making Plaintiff whole by paying actual damages;

C. Making Plaintiff whole by paying damages for his emotional distress;

D. Making Plaintiff whole by awarding punitive damages against these Defendants and in favor of Plaintiff;

E. Making Plaintiff whole by imposing a civil penalty of $25,000.00 against each of these Defendants;

F. For attorney's fees and costs of this suit;

G. For such further legal and equitable relief as this Court deems just.

SAMIR OUFKIR

By: /s/ Patricia E. Rademacher
Patricia E. Rademacher
RADEMACHER & ASSOCIATES
105 W. Adams Street
Suite 2325
Chicago, Illinois 60603
(312) 205-1010
(312) 205-1035 Direct
(312) 265-0045 Fax
prademacher@costonlaw.com